# In the United States Court of Appeals for the Seventh Circuit

---

GREGG BOCHAT AND PHILIP SIMONS,
*Plaintiffs-Appellants,*

v.

AMBIT ILLINOIS, LLC, ET AL.,
*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:24-cv-03116 (The Hon. Manish S. Shah)

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

D. GREG BLANKINSHIP
FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP
One North Broadway, Suite 900
White Plains, New York 10601
(914) 298-3281

J. BURKETT MCINTURFF
NATHAN A. RICE
WITTELS MCINTURFF PALIKOVIC
305 Broadway, 7th Floor
New York, NY 10007
(914) 775-8862

June 17, 2025

MATTHEW W.H. WESSLER
GREGORY A. BECK
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336

*Counsel for Plaintiffs-Appellants*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1325

Short Caption: Gregg Bochat, et al. v. Ambit Illinois, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☒    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Gregg Bochatt, Philip Simons

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Gupta Wessler LLP; Finkelstein, Blankinship, Frei-Person & Garber, LLP; Carroll Shamberg LLC;

 Wittels McIntruff Palikovic (NEW)

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/Matthew W.H. Wessler    Date: June 17, 2025

Attorney's Printed Name: Matthew W.H. Wessler

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ✓    No ☐

Address: 2001 K Street NW, Suite 850 North

    Washington, DC 20006

Phone Number: 202 888 1741    Fax Number: 202 888 7792

E-Mail Address: matt@guptawessler.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1325

Short Caption: Gregg Bochat, et al. v. Ambit Illinois, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Gregg Bochatt, Philip Simons

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Gupta Wessler LLP; Finkelstein, Blankinship, Frei-Pearson & Garber, LLP; Carroll Shamberg LLC;

Wittels McIntruff Palikovic (NEW)

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/Gregory A. Beck          Date: June 17, 2025

Attorney's Printed Name: Gregory A. Beck

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☐

Address: 2001 K Street NW, Suite 850 North

Washington, DC 20006

Phone Number: 202 888 1741          Fax Number: 202 888 7792

E-Mail Address: greg@guptawessler.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1325

Short Caption: Gregg Bochat, et al. v. Ambit Illinois, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Gregg Bochatt, Philip Simons

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Gupta Wessler LLP; Finkelstein, Blankinship, Frei-Peraon & Garber, LLP; Carroll Shamberg LLC;

Wittels McIntruff Palikovic (NEW)

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/Jessica E. Garland    Date: June 17, 2025

Attorney's Printed Name: Jessica E. Garland

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☐

Address: 505 Montgomery Street, Suite 625

San Francisco, CA 94111

Phone Number: (415) 573-0336    Fax Number: 202 888 7792

E-Mail Address: jessie@guptawessler.com

rev. 12/19 AK

# TABLE OF CONTENTS

Table of authorities ............................................................................... iii

Introduction ............................................................................................ 1

Jurisdictional statement ....................................................................... 4

Statement of issues ................................................................................ 5

Statement of the case ............................................................................ 5

    I.    Factual background ................................................................. 5

        A.    Ambit Energy ................................................................ 5

        B.    Ambit's Illinois operation .......................................... 9

        C.    Mr. Simons's and Mr. Bochat's experience with Ambit ............ 11

    II.    Procedural background ....................................................... 14

Standard of review ............................................................................... 18

Summary of argument ......................................................................... 18

Argument ............................................................................................... 23

    I.    Ambit lacks authority to unilaterally set aside the central provision of its contract—its contractual price guarantee .................... 23

        A.    Ambit's contract unambiguously permits amendment by notice in just three enumerated circumstances, none of which are applicable here ........................................ 23

        B.    The district court's conclusion that Ambit can amend "for any reason" impermissibly rewrites the contract .............. 27

        C.    The district court correctly rejected Ambit's alternative reading, which would render the amendment provision meaningless ............................................................... 34

D.    At a minimum, the amendment provision is ambiguous and should be construed against Ambit ....................................37

II.    Ambit's attempted unilateral amendment fails to satisfy the contract's requirements or basic principles of contract formation ........39

A.    Ambit did not provide the contractually required "material change notice" or opt-out period .............................39

B.    There was no mutual assent or consideration to form a new contract ..............................................................................43

C.    Ambit intentionally concealed the amended contract .............45

D.    At a minimum, the district court's dismissal at the pleadings stage was premature ...................................................48

Conclusion ....................................................................................................49

# TABLE OF AUTHORITIES

## Cases

*Air Line Stewards & Stewardesses Association, Local 550 v. Trans World Airlines, Inc.*,
713 F.2d 319 (7th Cir. 1983) .................................................................. 35

*Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*,
392 F.3d 881 (7th Cir. 2004) .................................................................. 35

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................. 49

*Boardman v. Service Employees International Union*,
89 F.4th 596 (2024) .............................................................................. 26

*Boomer v. AT&T Corp.*,
309 F.3d 404 (7th Cir. 2002) ............................................................ 33, 44

*Brandt v. MillerCoors, LLC*,
993 N.E.2d 116 (Ill. App. Ct. 2013) ...................................................... 35

*Buenz v. Frontline Transportation Co.*,
882 N.E.2d 525 (Ill. 2008) .................................................................... 24

*Burke v. 12 Rothschild's Liquor Mart, Inc.*,
593 N.E.2d 522 (Ill. 1992) ................................................................. 2, 28

*Call v. Ameritech Management Pension Plan*,
475 F.3d 816 (7th Cir. 2007) ................................................................. 33

*Campbell v. General Dynamics Government Systems Corp.*,
407 F.3d 546 (1st Cir. 2005) ................................................................. 42

*Central Illinois Light Co. v. Home Insurance Co.*,
821 N.E.2d 206 (Ill. 2004) ............................................................... 38, 40

*Central States, Southeast & Southwest Areas Pension Fund v. Kroger Co.*,
73 F.3d 727 (7th Cir. 1996) ................................................................... 37

*Chickasaw Nation v. United States,*
534 U.S. 84 (2001) ............................................................ 29, 30

*Cloud Corp. v. Hasbro, Inc.,*
314 F.3d 289 (7th Cir. 2002) ............................................. 32

*Cullinane v. Uber Technologies, Inc.,*
893 F.3d 53 (1st Cir. 2018) ................................................ 45

*Dahlstrom v. Sun-Times Media,*
777 F.3d 937 (7th Cir. 2015) ............................................. 30

*Dawson v. General Motors Corp.,*
977 F.2d 369 (7th Cir. 1992) ............................................. 38

*Decatur Lumber & Manufacturing Co. v. Crail,*
183 N.E. 228 (Ill. 1932) ..................................................... 31

*Domer v. Menard, Inc.,*
116 F.4th 686 (7th Cir. 2024) ........................................... 44

*Doyle v. Holy Cross Hospital,*
682 N.E.2d 68 (Ill. App. Ct. 1997) .................................... 34

*Eutectic Welding Alloys Corp. v. Rauch,*
115 N.E.2d 898 (Ill. 1953) ................................................. 42

*F.R.S. Development Co., Inc. v. American Community Bank & Trust,*
58 N.E.3d 26 (Ill. App. Ct. 2016) .................................. 32, 33

*Farm Credit Bank of St. Louis v. Whitlock,*
581 N.E.2d 664 (Ill. 1991) ................................................. 37

*Gallagher v. Lenart,*
874 N.E.2d 43 (Ill. 2007) ............................................. 23, 25

*Gordon v. Landfill, LLC,*
2021 IL App (5th) 200383-U (Ill. App. Ct. 2021) ............... 41

*Guterman Partners Energy, LLC v. Bridgeview Bank Group,*
105 N.E.3d 91 (Ill. App. Ct. 2018) .................................... 35

*Hill v. Gateway 2000, Inc.*,
    105 F.3d 1147 (7th Cir. 1997) ........................................................... 32, 43

*Hillman v. Maretta*,
    569 U.S. 483 (2013) ....................................................................... 28

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016) ........................................................ 46

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018) ....................................................................... 29

*Johnson v. Human Power of N Co.*,
    767 F. Supp. 3d 845 (N.D. Ill. 2025) ................................................. 45

*Kinkel v. Cingular Wireless, LLC*,
    828 N.E.2d 812 (Ill. App. Ct. 2005) ............................................. 32, 49

*Leak v. Board of Education of Rich Township High School District 227*,
    41 N.E.3d 501 (Ill. App. Ct. 2015) .................................................... 47

*Maher & Associates v. Quality Cabinets*,
    640 N.E.2d 1000 (Ill. App. Ct. 1994) ............................................ 23, 49

*Maturo v. CF Eagle Brook Arcis, LLC*,
    2025 IL App (2d) 240577-U (Ill. App. Ct. 2025) ............................. 33, 42

*Metcalfe v. First National Bank of Pittsfield*,
    39 N.E.2d 61 (Ill. App. Ct. 1941) ................................................. 36, 37

*Metzger v. DaRosa*,
    805 N.E.2d 1165 (Ill. 2004) ............................................................. 28

*Mid-West Energy Consultants, Inc. v. Covenant Home, Inc.*,
    815 N.E.2d 911 (Ill. App. Ct. 2004) .................................................. 47

*Monroe Dearborn Limited Partnership v. Board of Education of the City of Chicago*,
    648 N.E.2d 1055 (Ill. Ct. App. 1995) ................................................ 38

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) ....................................................................... 48

*Odle v. GameStop Corp.*,
    2025 WL 947884 (S.D. Ill. 2025)....................................................40, 46

*Operating Engineers Local 139 Health Benefit Fund v. Gustafson Construction Corp.*,
    258 F.3d 645 (7th Cir. 2001) ....................................................................45

*Pilon v. Discovery Communications, LLC*,
    --- F. Supp. 3d ---, 2025 WL 752244 (S.D.N.Y. 2025)........................................47

*Ray v. R.A. Mechanical, Inc.*,
    2023 IL App (1st) 221639-U (Ill. App. Ct. 2023)....................................................33

*Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*,
    870 F.3d 682 (7th Cir. 2017) ................................................................ 31

*Robinson v. Ada S. McKinley Community Services, Inc.*,
    19 F.3d 359 (7th Cir. 1994)..............................................................27, 33

*Ross v. May Co.*,
    880 N.E.2d 210 (Ill. App. Ct. 2007)....................................................43

*Schnabel v. Trilegiant Corp.*,
    697 F.3d 110 (2d Cir. 2012) ................................................................44

*Sgouros v. TransUnion Corp.*,
    817 F.3d 1029 (7th Cir. 2016) ..........................................................*passim*

*Silvis v. Ambit Energy, L.P.*,
    2018 WL 1010812 (E.D. Pa. 2018) .......................................................... 9

*Stampley v. Altom Transportation, Inc.*,
    958 F.3d 580 (7th Cir. 2020) ......................................................... 23, 35

*Thomas v. Pearle Vision, Inc.*,
    251 F.3d 1132 (7th Cir. 2001) ..............................................................39

*Thompson v. Gordon*,
    948 N.E.2d 39 (Ill. 2011) .........................................................31, 37, 38

*United States v. Brockamp*,
    519 U.S. 347 (1997)..............................................................................29

*United States v. Coscia,*
    866 F.3d 782 (7th Cir. 2017) ........................................................... 29, 30

*Viamedia, Inc. v. Comcast Corp.,*
    951 F.3d 429 (7th Cir. 2020) ................................................................ 18

*Williams v. County of Cook,*
    524 F. Supp. 3d 813 (N.D. Ill. 2021) ................................................... 45

*Wisconsin Knife Works v. National Metal Crafters,*
    781 F.2d 1280 (7th Cir. 1986) .............................................................. 33

## Statutes and Rules

28 U.S.C. § 1291 ...................................................................................... 4

28 U.S.C. § 1332 ...................................................................................... 4

220 Ill. Comp. Stat. 5 / § 9-220 ............................................................. 9

Federal Rule of Appellate Procedure 4 .................................................. 4

## Other Authorities

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ............................................................................................ 28

Antonin Scalia,
    *A Matter of Interpretation: Federal Courts and the Law* (1997) ....................... 29

*Due to,*
    *American Heritage Dictionary of the English Language* (5th ed. 2022) .......... 24

Ken Belson,
    *An Alternative to Con Ed Revs Up Its Sales Force*, New York Times
    (Aug. 31, 2008) .................................................................................... 5

*Notice,*
    *American Heritage Dictionary of the English Language* (5th ed. 2022) .......... 41

Office of Retail Market Development, Illinois Commerce Commission,
    *Annual Report* (2020) ......................................................................... 10

Press Release, New York Attorney General, Attorney General James
    Announces Restitution and Penalty Payments From Multiple Energy
    Service Companies For Consumer Fraud (Feb. 21, 2019) ................................... 8

*Provide*,
    *American Heritage Dictionary of the English Language* (5th ed. 2022).......................... 41

Rick Karlin,
    *Public Service Commission halts energy sales by ESCOs*, Times Union Capitol
    Bureau (July 15, 2016) ......................................................................................... 8

Steve Orr,
    *New York launches probe of energy provider Ambit*, Democrat & Chronicle
    (Rochester) (May 4, 2015) ...................................................................................7

*Webster's Ninth New Collegiate Dictionary* (1985) ...........................................29

# INTRODUCTION

Ambit Energy is a third-party energy supplier that markets itself to consumers as a cheaper alternative to their local utility. Because Ambit sells the same gas and electricity as the utility, there's only one reason why customers choose its services— to save money. Hoping to lure customers like the plaintiffs with promises of savings, Ambit's customer contract "guaranteed" that it would charge at least 1% less than the local utility's normal rate, or it would "send [them] a check for the difference." Ambit called this the "guaranteed savings plan." App6–7. Because Ambit's contract continuously renewed and allowed Ambit to terminate or amend only in narrowly defined circumstances, customers had no reason to doubt that they would keep those contractually guaranteed savings for as long as they stuck with Ambit.

But this "guarantee" was really a trap for the unwary. After signing up customers, Ambit discreetly mailed them new fine-print contracts (in envelopes disguised as "junk mail"). App21. Understanding "that defaults are powerful drivers of consumer behavior," the company surreptitiously inserted a new contract term requiring customers to repeatedly re-enroll in the guaranteed savings plan every twelve months. App21. If they didn't, Ambit would switch them automatically to a new plan—one that offered the exact same energy supply but, far from offering guaranteed savings, charged a variable rate that was "much higher" than the local utility. App9. In the end, this amounted to hundreds of dollars of unjustified charges

to the plaintiffs and other customers: Gregg Bochat, for example, paid a total of $535 more than the utility would have charged him, while Philip Simons paid $469 more. App23–24.

Ambit's binding customer contract, however, gives it no authority to renege on its price guarantee in this way. The agreement allows the company to unilaterally amend its contract only in narrow circumstances, when the amendment is "due to" one of three enumerated "changes": (1) "in regulatory rules," (2) "applicable laws," or (3) the utility's "tariff." App33, 35. Ambit's desire to break its 1% saving guarantee and charge higher prices isn't one of them. Nevertheless, the district court held that Ambit's contract not only authorizes the unilateral amendment, but that it does so "unambiguous[ly]." SA7. The court did not dispute that the contract's plain language expressly allows amendments in just three circumstances. But it concluded that, in "the absence of language of exclusivity," the provision *impliedly* authorizes amendments for additional reasons—indeed, in the district court's view, "for any reason" at all. *Id.*

That was error. Under well-established Illinois contract law, a contract that "lists the things to which it refers" necessarily excludes the things not listed, with or without "negative words of limitation." *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 593 N.E.2d 522, 527 (Ill. 1992). If a sign says that children under twelve enter for free, it goes without saying that a thirteen-year-old must pay. Similarly, when the plain

language of Ambit's contract provides three specific circumstances permitting amendment, it means what it says. At the very least, a contract that authorizes three kinds of amendments can't be said to *unambiguously* authorize a fourth.

Even if Ambit's contract could support the district court's atextual reading, Ambit's contract still required it to provide customers with a "material change notice" and an opportunity to opt out before unilaterally imposing new contract terms. App33, 35. Instead, the company made its best effort to slip the amendment past customers. The supposed "notice" appeared as junk mail and its contents didn't identify any "change" in the contract's terms. App21. It also never mentioned the customers' newly created duty to affirmatively opt into the guaranteed savings plan. This strategy was intentional: Ambit "estimated that 65% of its customers would not send written notice for renewal, resulting in tens of millions of dollars in additional payments to Ambit for the same … gas and electricity." App10.

The district court's second error was in holding that Ambit's intentionally misleading notice was sufficient to bind customers. Again, it goes without saying that a party cannot be bound by unilaterally imposed contract terms before receiving reasonable notice of what those terms say. At a minimum, the adequacy of Ambit's notice raises factual questions that—like the meaning of ambiguous terms—should not have been decided on a motion to dismiss. This Court should reverse.

## JURISDICTIONAL STATEMENT

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000; (ii) there are 100 or more class members; and (iii) some members of the class are citizens of states different from some defendants. App16; *see* SA4 n.2. First, plaintiffs estimate the amount in controversy will be over $190 million. CA7 Dkt. 11 at 2. Second, the class includes significantly more than 100 members because it includes the more than 38,000 customers that Ambit had in Illinois that are similarly situated to the named plaintiffs. *Id.* Finally, the named plaintiffs, Mr. Simons and Mr. Bochat, are both citizens of Illinois but the defendants are not. App13–14. Defendant Ambit Energy is owned by Volt Asset Company, a Delaware corporation with its principal place of business in Austin, Texas. App13. Defendant Volt Asset Company, in turn, is a wholly owned subsidiary of defendant Vistra Corporation, a Delaware corporation with its principal place of business in Irving, Texas. App14; CA7 Dkt. 11 at 1–2.

This Court has jurisdiction over the appeal under 28 U.S.C. § 1291 because the district court granted final judgment to the defendants on all claims. SA11. The district court entered its order granting the defendants' motion to dismiss on January 27, 2025. *Id.* Mr. Simons and Mr. Bochat timely filed a notice of appeal under Federal Rule of Appellate Procedure 4(a)(1)(A) on February 26, 2025. App45.

**STATEMENT OF ISSUES**

1. Does a contract term authorizing unilateral amendments in three specific circumstances also impliedly authorize unilateral amendments for any other reason?

2. Did Ambit provide sufficient notice of contract modification to bind the plaintiffs to a new, unilaterally imposed pricing plan?

**STATEMENT OF THE CASE**

## I.  Factual background

### A.  Ambit Energy

In the late 1990s, states began deregulating the market for energy supply, allowing alternatives to large public utilities to enter the market. App5, 17. These start-up energy service companies generally "promis[ed] to supply gas and electricity cheaper" than the traditional utility. Ken Belson, *An Alternative to Con Ed Revs Up Its Sales Force*, N.Y. Times (Aug. 31, 2008), https://perma.cc/LVQ5-B5CJ. Many began using door-to-door salespeople to recruit customers—frequently targeting elderly and limited-English-speaking households—and other salespeople. *See id.*

Ambit Energy is one of those third-party suppliers that uses the mechanics of multi-level marketing to make sales. Ambit recruits a vast network of "independent consultants" to "sell friends" Ambit's energy contracts. *Id.* After charging their "consultants" an initial fee, Ambit rewards them when they recruit new consultants, as well as when they enroll new customers. *Id.* This strategy has proved successful— Ambit has become one of the nation's largest independent energy suppliers. App5.

Ambit serves over one million electric and natural gas customers, 94% of whom are residential consumers. App5–6.

But Ambit faces a challenge in convincing consumers to switch to its service from their existing local utility. Ambit provides "the exact same energy as existing utilities[.]" App6. It does not own infrastructure or generate energy; it just buys energy on wholesale markets to resell to individual customers. *See* Residential & Small Non-residential Retail Energy Mkts., No. 12-M-0476, at 4–6 (N.Y. Pub. Serv. Comm'n 2014) (order), https://perma.cc/L73D-AVCU. Consumers "have no reason to switch to Ambit other than to save money." App6. So, to convince consumers to switch, Ambit promises "a supposedly sure thing: guaranteed savings compared to what their existing utility charges." *Id.* Ambit offered a "Guaranteed Savings Plan" in which it promised customers that they would pay at least 1% less than their existing utility charged on an annual basis, or receive a check for the difference—enshrining this promise in both their customer contract and a signed certificate.



App6–7.

Yet after convincing consumers to sign up based on that promise, Ambit reneged—charging customers prices that are much higher than those charged by existing utilities.

Over a decade ago, the New York State Public Service Commission's Office of Consumer Services began investigating Ambit after receiving a flood of customer complaints—twice as many complaints as for any other energy supplier. Steve Orr, *New York launches probe of energy provider Ambit*, Democrat & Chron. (Rochester) (May 4, 2015), https://perma.cc/S9AN-6ZXV. New York customers complained that Ambit improperly switched them from a "Guaranteed Savings Plan" to a more expensive plan, called a "Variable Plan," without proper disclosures or notice. Ambit quickly

"conceded" that its "practice of moving people off the guaranteed-savings plan into a variable rate plan" with "significantly higher rates" had harmed consumers. App26. And in 2015, Ambit promised the New York Commission that it would refund "all impacted customers" and "make all reasonable efforts to be[] fully compliant[.]" *Id.* The New York Commission nevertheless eventually issued a moratorium on the sale of energy by suppliers like Ambit to low-income families because they charged consumers more than traditional utilities. Rick Karlin, *Public Service Commission halts energy sales by ESCOs*, Times Union Capitol Bureau (July 15, 2016), https://perma.cc/YYS2-ZZ89.

In 2019, the New York Attorney General released the results of its own investigation into Ambit: Ambit was an "unscrupulous energy service company[y]" that "misrepresented that consumers would achieve savings." *See* Press Release, N.Y. Att'y Gen., Att'y Gen. James Announces Restitution and Penalty Payments From Multiple Energy Serv. Cos. For Consumer Fraud (Feb. 21, 2019), https://perma.cc/RJS7-BGNX. After the Attorney General determined that Ambit had switched consumers to higher-cost plans without adequate disclosure, the company reached a settlement that included a substantial penalty. *Id.* The Attorney General specified that Ambit owed that penalty in addition to the $26.5 million it had already promised to compensate consumers for switching them off a guaranteed savings plan onto a more costly plan as part of a class action settlement. *Id.*; Class

Action Settlement Agreement at 7, *Simmons v. Ambit Energy Holdings*, No. 503285/2015 (N.Y. Sup. Ct. Sept. 5, 2019), Dkt. 211.

Ambit's misrepresentations were not just limited to New York. For example, in Pennsylvania it similarly "solicited customers … with 'teaser rates,'" but after customers signed up, it changed the rates and charged them at rates roughly "double that of [their] local energy provider[s]." *Silvis v. Ambit Energy, L.P.*, 2018 WL 1010812, at *1 (E.D. Pa. 2018). Pennsylvanian consumers also brought a class action, alleging that Ambit "failed to act in good faith" by "ma[king] promises and contracts [the company] did not intend to honor." *Id.* In 2018, a federal judge approved a 9.3-million-dollar settlement in that case. *Id.* at *2.

## B.    Ambit's Illinois operation

Since Illinois opened its retail gas and electric markets to competition over two decades ago, more than 3 million Illinois consumers have switched to an alternative energy service company like Ambit. App17. In Illinois, although state utilities are required to simply pass through their costs to provide customers' energy supply, there is no similar protection for the rates alternative suppliers charge. 220 Ill. Comp. Stat. 5 / § 9-220. These third-party suppliers are subject to only "minimal regulation by Illinois's utility regulator." App17. "Companies like Ambit do not have to [publicly] file their rates, or the method by which those rates are set." *Id.* And from 2015–2020, Illinois consumers lost over $1 billion to alternative retail electric suppliers. Off. of

Retail Mkt. Dev., Ill. Com. Comm'n, *Annual Report* at 28, 31. (2020), https://perma.cc/2HZ9-LVTX.

Just like in New York and Pennsylvania, when Illinois customers switched to Ambit, their energy "continu[ed]" to be physically "deliver[ed]" by the "public utilities." App17. The product remained the same so the only reason "to switch to Ambit" was the price. App6, 17. Like in New York, Ambit offered "a supposedly sure thing": it contractually "guaranteed annual savings of at least one percent" compared to what the customer's existing utility charged. App7 (certificate). But after customers enrolled in this "Guaranteed Savings Plan," Ambit began switching them onto a newly created plan, the "Illinois Select Variable Plan." App18. The rates under the Variable Plan were always higher than the comparable utility rate. App21-24.

Many customers had no idea that Ambit had switched their plans. App7–10, 21. Although Ambit moved its Guaranteed Savings Plan customers over to its Variable Plan en masse, Ambit "neither advertised nor" provided any information about "the Variable Plan in its marketing materials or on its website." App8. In fact, new Ambit customers could not even sign up for the Variable Plan directly; the only way a customer could become a member was through default. *Id.* Yet, before switching customers over to the Variable Plan, Ambit only sent out "inconspicuous" mailers that "appeared as junk mail." App21–22. The letter Ambit included in the

junk mailer did not mention customers' newly created duty to affirmatively opt into the Guaranteed Savings Plan or lose their right to those savings. *Id.* at 17; *see also* App37 (Ambit's letter to Simons); App41 (Ambit's letter to Bochat). To the contrary, the letters "were designed to ensure that customers did not read or notice" the new obligation. App11. Only by parsing through seventeen provisions related to various topics about Ambit's service could customers find that they now suddenly had to actively "renew your Guaranteed Savings Plan to continue to receive the 1% annual savings guarantee"—otherwise they would be switched to the "Variable Plan." App37–44. But not even the contract disclosed that the Variable Plan was more expensive than customers' utility. *Id.*

As a result, Ambit estimated that 65% of its customers would not send a notice for renewal to remain on the Guaranteed Savings Plan. App10. And Ambit expected that once it switched a consumer to the Variable Plan, "it could charge high energy rates and many consumers (if not most) would simply unknowingly pay"—"resulting in tens of millions of dollars in additional payments." App10–12.

## C.    Mr. Simons's and Mr. Bochat's experience with Ambit

**1.** In 2009 and 2010, Mr. Simons and Mr. Bochat signed up for Ambit's "Guaranteed Savings Plan" to receive a promised "guaranteed annual savings of at least one percent under what Nicor Gas would have charged [them] for service." App7, 13. Ambit "imposed on its customers a standard, non-negotiable" "Guaranteed

Savings" contract. *Id.*; App32–36. This included "an "Amendments" provision that specified when Ambit could change the contract without following the standard black-letter rules for materially amending a contract:

> Ambit Energy reserves the right to amend or terminate this Agreement due to changes in regulatory rules and requirements, any and all applicable laws, or Nicor's Customer Select tariff. If Nicor materially changes its Customer Select Program, Ambit Energy reserves the right to terminate this contract, without recourse to either party. Ambit Energy reserves the right to amend this Agreement at a later date. If Ambit Energy materially changes the provisions of this Agreement to the disadvantage of the Customer, Ambit Energy will provide 45 days notice prior to the effective date of such material change and provide the customer with 45 days to opt out of the new provisions at no cost, beginning on the postmarked date of the material change notice sent by Ambit Energy to the Customer. If the Customer does not respond to the material change notice within the 45 days to notify Ambit Energy that it elects to opt out of this Agreement within the customer opt out time period, this Agreement will continue in effect under the amended terms of service.

App33, 35.

Mr. Bochat's contract had an additional section at the end entitled: "acceptance and amendments." App36. That section included a sentence stating that: "Ambit may amend the terms of this Agreement at any time, consistent with any applicable law, rule or regulation, by providing notice to Customer of such amendment at least thirty (30) days prior to the effective date thereof." *Id.*

**2.** In 2012, when Ambit "began automatically shifting Guaranteed Savings Plan customers onto the Illinois Select Variable Plan," App8, Mr. Simons and Mr. Bochat were among the many consumers Ambit switched over to the more expensive

Variable Plan. App13. Under this new plan, Ambit eliminated the promised benefits of the 1% savings guarantee. App8. The only notice the two customers received of this change was through "inconspicuous mailers" that "simply stated that new or updated terms of service were enclosed." App9–10, App21. The "mailer[s] did not even contain the words 'change' or 'amendment, much less 'notice of a material change.'" App21. Buried within them was the instruction to affirmatively renew their guaranteed savings contract to keep the low rate they had been promised. App9, 20.

After Ambit switched Mr. Simons and Mr. Bochat onto the Variable Plan, it began charging them more than their local utility. App21–24. Within a little over a year, Mr. Bochat's monthly charges for gas "jumped significantly." App23. In March of 2014, Ambit charged Mr. Bochat $77 over the public utility's rates. App22. In January 2015, Ambit charged him $96 over the utility's rates. App23. Mr. Bochat then canceled his Ambit service. App13. The "extra charges over the course of 24 months totaled $535.82." App23.

Ambit also charged Mr. Simons "significantly higher amounts" "as compared to what Mr. Simons's utility (NICOR) would have charged." App23. These charges reached their peak in January of 2022, when he was charged $85 more than the utility would have charged. App24. Soon after he switched gas providers. App13. In his last 21 months with Ambit, Ambit charged him $469.35 more than the utility. App24.

## II. Procedural background

**1.** Mr. Bochat and Mr. Simons filed a class action on behalf of themselves and other Illinois consumers whom Ambit similarly switched from the Guaranteed Savings Plan to a different Ambit plan. App27. They argued that Ambit breached its contract by switching them to the higher cost plan without authorization. Their contracts' amendment provisions stated that "Ambit reserves the right to amend or terminate this Agreement due to changes in regulatory rules and requirements, any and all applicable laws, or Nicor's Customer Select tariff." App33, 35. And it specified procedures Ambit could employ to amend if any of these three changes happened—give consumers "45 days to opt out of the new provisions at no cost"—that are less rigorous than what black-letter contract law usually requires for material contractual changes. *Id.* But, the plaintiffs alleged, none of the three specified changes occurred, so Ambit did not have the right to amend the contract and terminate the guaranteed savings promise under the less rigorous methods specified in the contract's amendment provision. App20; *see id.* (quoting Ambit's Co-CEO admitting that the plans were not switched "due to changes in regulatory rules and requirements[,] … applicable law, or Nicor's Customer Select tariff").

The plaintiffs argued that they were owed damages for each year Ambit breached their guaranteed savings contracts by failing to supply them energy at 1% less than what the utility would have charged. App9, 13. They also argued that Ambit

breached its implied duty of good faith and fair dealing by changing its contract without giving consumers any "reason to suspect that they would automatically become participants in the Variable Plan" for the purpose of benefiting Ambit at the expense of its customers. App20, 31.

**2.** Ambit moved to dismiss, arguing that the company had reserved the right to amend the contract "for any reason" without its consumers' affirmative consent so long as it gave consumers "'45 days to opt out of the new provisions' without penalty." Dkt. 25 at 2. Ambit argued that the contract's amendment provision did not "suggest that the contracts could only be amended because of changes to regulations, laws, or the utility tariff." *Id.* at 9. Ambit pointed to a sentence in the provision stating that "Ambit Energy reserves the right to amend this Agreement at a later date." *Id.* Ambit argued that sentence meant that amendments using the 45-day notice procedure were permitted not just for the three reasons the contract explicitly enumerated, but "for any reason." *Id.* at 2, 9. Therefore, Ambit asserted, it only amended, not breached, the contract. Finally, Ambit argued that the plaintiffs' implied covenant claim should be dismissed because such claims cannot stand without a related breach of contract claim. *Id.* at 12–13.

**3.** Mr. Bochat and Mr. Simons opposed Ambit's motion, explaining that the company's parsing failed to construe the words of the "contract within the context of the contract as a whole." Dkt. 26 at 3. The original contract had "specifically

allow[ed] for amendments" under a specialized procedure "'due to' only three identifiable categories of 'changes.'" Dkt. 26 at 1–2. Even Ambit "admitted" that none of those three categories applied. App20. And the subsequent sentence allowing Ambit to "amend this Agreement at a later date" did not give Ambit an "unqualified" right to amend under the specialized procedures "for any reason." Dkt. 26 at 2–3. That sentence was "just a timing provision" "clarifying that Ambit did not have to act immediately following the occurrence of one of the three enumerated 'changes.'" *Id.* at 2–3. The plaintiffs argued that basic rules of contract interpretation reinforced their common-sense reading. If, as Ambit asserts, the timing sentence had given Ambit an "unqualified" right to amend, there would have been "no reason for the contract to specify a right to amend 'due to' three identifiable categories of 'changes.'" *Id.* Ambit's reading would render that first sentence of the amendment paragraph "superfluous." *Id.* at 3–4.

Finally, the plaintiffs explained that Ambit "misconstrue[d]" their breach of implied covenant claim. They argued that their implied covenant claim shows what the parties intended when entering the contract and therefore why Mr. Bochat and Mr. Simons have the best reading of the "contract's express terms." *Id.* at 7–8.

**4.** The district court adopted Ambit's reading of the contract. The court recognized that Ambit had "marketed itself as a less-expensive alternative to existing providers." SA2. And when Ambit "switch[ed] plaintiffs from the guaranteed savings

plan" that it had marketed "to one which could charge consumers much more," it "material[ly]" changed the contract. SA8. But, the court concluded, that change was unambiguously permitted by the contract.

The court did not base its holding on any contractual text giving Ambit explicit permission to amend the contract for any reason. It agreed with the plaintiffs that the sentence "allow[ing] for amendment 'at a later time'" "must refer to the timing of an amendment," rather than providing the reasons an amendment could be made. SA7. Instead, the court held that "it is the absence of any text suggesting exclusivity that gives Ambit the right to seek an amendment for any reason." *Id.* The court recognized that the first sentence of the amendment provision enumerated three conditions under which Ambit reserved the right to amend. SA6. Yet it determined that "there is no basis to read the list as abrogating either party's right to renegotiate and bargain for new terms with consideration." *Id.*

But the court didn't stop at holding that the contract did not limit Ambit's ability to amend for any reason under the standard black-letter process—by "renegotiat[ing] and bargain[ing] for new terms with consideration." SA6. It went on to hold that the contract affirmatively gave Ambit the power to materially change the contract "for any reason" without any new consideration. SA6–7. The court held that the only constraint on Ambit's authority to amend the contract "for any reason" was the requirement to give consumers 45 days' notice and an opportunity to opt out

of the change. SA7–8. After finding that Ambit had provided 45 days' notice before switching the consumers onto the Variable Plan, it concluded that Ambit had the authority to make that unilateral change. SA9–11.

The court then dismissed the case. In doing so, the court never addressed the plaintiffs' implied covenant of good faith and fair dealing claim. And it only briefly mentioned in a footnote the additional "reference to amendments" in Mr. Bochat's contract, which permitted Ambit to "amend the terms of this Agreement at any time, consistent with any applicable law, rule or regulation." SA7 n.4. The court noted that "[t]his term clearly provides that Ambit may amend Bochat's contract for any lawful reason[,]" but it did not state that the sentence provided any additional support for Ambit's unilateral-amendment process. *Id.*

## STANDARD OF REVIEW

This Court "review[s] de novo a grant of a motion to dismiss, constru[ing] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [its] favor." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir. 2020).

## SUMMARY OF ARGUMENT

**I.** The plain language of Ambit's customer contract unambiguously forecloses the company's position. The contract reserves the company's right to unilaterally amend its terms *only* due to a change in regulations, laws, or Nicor's tariff. Because

Ambit's desire to move customers to a more expensive plan is not one of those reasons, it is not a ground for unilateral amendment. That conclusion is bolstered by the rest of the contract, which repeatedly "guarantee[s]" savings over utility rates and strictly limits the circumstances under which Ambit may terminate or amend the agreement to situations beyond Ambit's control. App6, 8. A reasonable customer reading those terms would have believed that Ambit lacked authority to unilaterally amend the contract absent one of the three circumstances listed.

The district court erred by holding that the absence of any "text suggesting exclusivity" means that Ambit can amend for *any* reason. SA7. Under the negative-implication canon, the contract's specific provision of three explicit grounds for amendment rules out other reasons for amendment—even without express language of exclusivity. Ambit knew how to draft a nonexclusive list when it wanted to: Its contract in other places uses the words "including" or "including but not limited to" to convey this meaning. *See* App33, 35–36. To interpret the unilateral-amendment provision the same way would be to rewrite the contract, implicitly adding additional nonexclusive language to which the parties did not agree.

The court likewise erred by reading the unilateral-amendment provision broadly on the ground that parties can ordinarily amend a contract "for any reason" by exchanging "new promises for new consideration." SA6. Nobody is arguing here that Ambit's amendment satisfies all the requirements for forming an original

contract. For one thing, there would be no consideration for such a contract, given that all the plaintiffs get out of the amendment is the privilege of continuing to buy the exact same natural gas without the savings guarantee they previously enjoyed. Instead, the question here is whether Ambit can limit the circumstances in which it is authorized to *unilaterally* amend. As author of the contract, Ambit was free to impose such limits and, having done so, is bound by them.

The court was correct, however, to reject Ambit's reliance on the third sentence of the same paragraph as an independent source of amendment authority. If that provision really authorized Ambit to amend for any reason, there would have been no need—just two sentences earlier—to grant the company authority to amend in just three limited circumstances. Ambit's reading would render that more limited grant of authority meaningless and violate the fundamental rule of contract interpretation that courts, whenever possible, should harmonize contract provisions to preserve their independent meaning. Here, the district court easily harmonized the amendment provisions, finding that the first sentence is about Ambit's right to amend the agreement, while the third is a "timing provision" giving the company flexibility to do so "*at a later time*." SA7 (emphasis added). That reading reconciles the contract's amendment provisions by reading them together to form a consistent plan. In contrast, Ambit's reading would again nullify the contract's language by leaving the words "at a later date" with no role to play.

Even if one of these alternative contract readings were reasonable, it wouldn't be the *only* reasonable interpretation. The plaintiffs' interpretation is the only one that gives meaning to all the contract's language and is thus at least an equally reasonable alternative. At a minimum, the contract is thus ambiguous. Under Illinois law, resolving that ambiguity is a question of fact that cannot be decided on a motion to dismiss. And if there is no fact dispute, Illinois law requires that the ambiguity be read against Ambit, as the drafter of this adhesion contract. The district court therefore erred in dismissing the complaint at the pleading stage.

**II.** Even if the contract did permit Ambit to unilaterally amend to essentially revoke the savings guarantee, the company would still have to provide the "material change notice" and 45-day opt-out period that the contract requires before an amendment can become effective. Ambit did neither. It never sent plaintiffs anything called a "material change notice." The letter Ambit mailed (which was disguised as junk mail) didn't mention any "change" to the contract's terms or include the word "material." It said nothing about the new automatic-default provision, and it contained no hint that the customer's plan might automatically change—much less that the rates under the Variable Plan would be much higher than those charged by the local utility. Nor did Ambit's "notice" provide customers with a right to opt out, specify an opt-out deadline, or provide a mechanism for opting out. Because the supposed "notice" did not comply with the contract's "material change notice"

provision nor provided an opportunity to opt out, Ambit cannot claim that the plaintiffs' silence constituted acceptance of an amended contract.

The district court nevertheless held that the plaintiffs were bound by the amendment by remaining silent and continuing to use Ambit's services after allegedly receiving the new contract in the mail. But again, the question here is not whether the *plaintiffs* bound themselves to the amendment's terms (which would require consideration), but whether Ambit could bind them *unilaterally*. The contract is clear that such a unilateral amendment requires both a material change notice and a meaningful opt-out period—neither of which Ambit provided.

In any event, parties cannot be said to have passively accepted a new contract unless they first receive reasonably conspicuous notice of its terms. *See Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–34 (7th Cir. 2016). Here, the plaintiffs never received such reasonable notice because—unlike the cases on which the district court relied—Ambit's "notice" said nothing about the new contractual changes. Under Illinois law, the plaintiffs could not have assented to terms for which they never received notice.

Rather than providing its customers with reasonable notice, Ambit actively misled them. By informing customers that they "*may* renew" their "current plan," App37, 41, Ambit's notice suggested that renewal was optional. Ambit's newly amended contract, however, says that customers "*must* renew" or lose their

guaranteed savings. App38, 42. What's worse, Ambit disguised the notice by sending it in mailers that looked like "junk mail." App20–21. As a consequence, the company estimated that 65% of its customers would not respond to the notice—"resulting in tens of millions of dollars in additional payments to Ambit for the same exact commodity." App10. Ambit's notice cannot be adequate where, as here, it "actively mislead[] the customer." *Sgouros*, 817 F.3d at 1035.

Ultimately, however, the question of "[w]hether the terms of a written contract are modified by acts or conduct is a question for the trier of fact." *Maher & Assocs. v. Quality Cabinets*, 640 N.E.2d 1000, 1007 (Ill. App. Ct. 1994). At a minimum, the district court erred by making that determination at the pleading stage, before critical evidence bearing on the question (such as Ambit's "junk" mailer) is even in the record. This Court should reverse.

## ARGUMENT

### I. Ambit lacks authority to unilaterally set aside the central provision of its contract—its contractual price guarantee.

#### A. Ambit's contract unambiguously permits amendment by notice in just three enumerated circumstances, none of which are applicable here.

As in any question of contract interpretation, this Court must begin with "the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Stampley v. Altom Transp., Inc.*, 958 F.3d 580, 586 (7th Cir. 2020) (quoting *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007)). Under

Illinois law, the "cardinal rule of contract interpretation is to discern the parties' intent from the contract language." *Buenz v. Frontline Transp. Co.*, 882 N.E.2d 525, 528–29 (Ill. 2008). "Where the contract language is unambiguous, it should be given its plain and ordinary meaning." *Id.* at 529.

Here, the "plain and ordinary meaning" of Ambit's contract unambiguously forecloses the company's position. In the section titled "AMENDMENTS," Ambit "reserves the right" to unilaterally amend the agreement "due to changes in" just three enumerated areas: (1) "regulatory rules and requirements," (2) "applicable laws, or" (3) "NICOR's Customer Select tariff." App33, 39. The words "due to" make clear that this provision applies only if the reason for the amendment is one of the three circumstances listed—a change in regulations, laws, or tariff. *See Due to*, *Am. Heritage Dictionary of the Eng. Language* (5th ed. 2022) ("due to" means "[b]ecause of"). In those three listed circumstances—and only in those circumstances—the contract authorizes Ambit to make "material[] changes" to the agreement "to the disadvantage of" customers by giving affected customers "45 days notice prior to the effective date of such material change and … 45 days to opt out of the new provisions at no cost." App33, 35. That plain language is all that's required to resolve this appeal: The contract expressly lists the circumstances in which an amendment is authorized, and moving customers to a new, higher-priced plan that lacks a savings guarantee is not among them.

This conclusion is further supported by the contract's purpose and structure as a whole. *See Gallagher*, 874 N.E.2d at 58 ("[B]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others."). Here, the contract's main purpose—and the only reason that customers would choose Ambit's services—is to "guarantee" savings compared to their local utility. On the first page of Ambit's customer contract, the company promises customers that they are "*guaranteed* an annual savings of one percent (1%) less than the incumbent utility's published supply rate." App32, 34 (emphasis added). The contract is emphatic on this, repeating the words "guarantee" or "guaranteed" five times. *See* App34–35. To back that up, the agreement promises three separate times that, if the plaintiffs do "not save at least 1% over the incumbent utility's published gas rate," it will "send [them] a check for the difference." App32, 34 ("Ambit Energy will issue you a refund or credit for the overage amount."); App32, 35 ("Ambit Energy will provide refunds, in a timely fashion, of all undisputed overpayments.").

That "guarantee" would mean nothing if Ambit could back out arbitrarily, so the contract delineates the limited circumstances in which the customer will not receive their guaranteed savings. It authorizes Ambit to withdraw its price guarantee in only one circumstance: if the customer "has not yet enrolled in any [] plan." App33, 36. After that, it recognizes that prices may change in only two cases. *First*, if

a customer "switches to another supplier or back to Nicor," the agreement notes that "Nicor may charge a price other than the purchased gas adjustment rate." App32, 35. *Second*, the agreement mentions that "price changes" may result from "Force Majeure Events," which it defines as "including, but not limited to acts of God, severe weather events, acts of government, accidents, strikes, labor disputes, changes in laws, rules, or regulations, or any and all events beyond Ambit Energy's control." App33, 35. Like the provision restricting amendments to changes in regulations, laws, or tariffs, these provisions are limited to situations where Ambit has no choice but to raise prices.[1]

Ambit's terms also limit its authority to terminate the contract, while leaving the customer "free to switch suppliers at any time." App32, 34. Aside from the amendment provision at issue here (covering changes in regulations, laws, and Nicor's tariff), Ambit agrees that it will end the contract only if a customer "fails to pay the required deposit," *id.*, "is 45 or more days in arrears," App32, 35, is unable

---

[1] One of the named plaintiffs' contracts has an additional amendment provision allowing Ambit to amend the terms "at any time" by providing 30 days' notice. App36 ("Ambit may amend the terms of this Agreement at any time, consistent with any applicable law, rule or regulation, by providing notice to Customer of such amendment at least thirty (30) days prior to the effective date thereof."). Although the district court briefly mentioned its existence in a footnote, SA7 n.4, Ambit didn't argue below that this provision gave it independent authority for the amendment and so it has waived any argument related to this provision on appeal. *See Boardman v. Serv. Emps. Int'l Union*, 89 F.4th 596, 600 (2024) ("It is well settled that arguments not raised in the district court are waived on appeal.").

"to maintain satisfactory credit standing," App36, or fails "to meet minimum or maximum threshold consumption levels," *id.* Otherwise, Ambit promises to "make a commercially reasonable effort to supply natural gas service" during the whole contract term. App33, App35.

Considering all this, a customer who read the contract terms would have "reasonably believe[d]" that Ambit lacks authority to unilaterally revoke its price guarantee—at least unless one of the three circumstances justifying amendment is satisfied. *Robinson v. Ada S. McKinley Cmty. Servs., Inc.*, 19 F.3d 359, 363 (7th Cir. 1994). If there were any doubt about that, Ambit memorialized its "guaranteed annual savings of at least one percent" in a certificate signed by the company's co-founders. App7. Ambit thus "lulled customers into thinking that once they signed up" for the guaranteed savings plan, "they did not have to take any action to be sure that they saved money compared to utility rates." App10, 20.

## B. The district court's conclusion that Ambit can amend "for any reason" impermissibly rewrites the contract.

**1.** The district court nevertheless held that the Ambit's unilateral-amendment provision, although expressly limited to changes in regulations, laws, or tariffs, does not "limit[] Ambit to amending only if such changes occurred." SA5; *see also* SA7 (holding that the amendment provision does not "limit[] the reasons Ambit could ever seek amendment"). The "list of three reasons for amendment," the court stated, "does not say that they are the only reasons the parties may amend." SA6. In "the

absence of any text suggesting exclusivity," it concluded, the agreement "gives Ambit the right to seek an amendment *for any reason*, subject to the bargained-for procedures to consummate an amendment." SA7 (emphasis added). And because it considered "the absence of language of exclusivity [to be] unambiguous," the court held as a matter of law that "Ambit was allowed to try to amend both plaintiffs' contracts in 2012 despite there being no change in regulatory rules, laws, or tariff." SA7–8.

The district court erred by demanding additional "language of exclusivity" when the contract was already clear on its face. Under the negative-implication canon, the "expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012). Thus, when a text "lists the things to which it refers, there is an inference that all omissions should be understood as exclusions." *Metzger v. DaRosa*, 805 N.E.2d 1165, 1172 (Ill. 2004); *see also, e.g.*, *Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (when a text "explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied"). And that is true "despite the lack of any negative words of limitation." *Burke v. 12 Rothschild's Liquor Mart*, 593 N.E.2d 522, 527 (Ill. 1992).

Justice Scalia gave a common-sense example: "If you see a sign that says children under twelve may enter free, you should have no need to ask whether your thirteen-year-old must pay." Antonin Scalia, *A Matter of Interpretation: Federal Courts and*

*the Law* 25 (1997). Likewise, there's no need to ask whether, after enumerating three valid circumstances for amendment, Ambit's contract also permits amendments in an unspecified fourth. The express language providing for unilateral amendments in three listed circumstances "implies that there are no *other* circumstances under which" amendments are permitted. *Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018). Ambit's "explicit listing" of those reasons thus prevents courts from "read[ing] other unmentioned, open-ended, 'equitable' exceptions" into the contract. *United States v. Brockamp*, 519 U.S. 347, 352 (1997).

**2.** The district court recognized that the contract could have "better convey[ed] a nonexclusive list" if, rather than just listing the three grounds for amendment, it had instead said "that Ambit reserves the right to amend for reasons 'including' the three items." SA6. But the addition of the word "including" to the unilateral-amendment provision wouldn't just make a "better" case for reading it as a nonexclusive list; it would completely change the sentence's meaning. "To 'include' is to 'contain' or 'comprise as part of a whole.'" *Chickasaw Nation v. United States*, 534 U.S. 84, 89 (2001) (quoting *Webster's Ninth New Collegiate Dictionary* 609 (1985)). The "use of the word 'including,'" because it is express language of non-exclusivity, would thus single-handedly "render[] the [sentence] illustrative." *United States v. Coscia*, 866 F.3d 782, 792 (7th Cir. 2017); *see also Dahlstrom v. Sun-Times Media*, 777 F.3d 937, 943

(7th Cir. 2015) ("[T]he term 'including' … is typically 'illustrative and not limitative.'").

Ambit's amendment provision, however, "has no such language and is thus meaningfully different." *Coscia*, 866 F.3d at 792. Indeed, the absence of the word "including" mandates the opposite conclusion here: that a list should be read "as definitional instead of illustrative." *Id.* Just as the word "including" shows that the list it introduces is illustrative, its absence shows the opposite: that the parties "intended the … list to be complete." *Chickasaw Nation*, 534 U.S. at 89.

Other parts of Ambit's contract do use the word "including" in the way the district court suggested. *See, e.g.*, App32, 34 (limiting the total amount of "deposits on file with Ambit Energy, including both initial and additional deposits"); App33, 35 (disclaiming "all other warranties, including warranties of merchantability and fitness for a particular purpose"); *id.* (authorizing Ambit to access customers' "account information, including account number(s), meter number(s), payment history and credit history"). In some cases, the contract makes this non-exclusive language even more explicit by adding the words "but not limited to." *See, e.g.*, *id.* (providing that Ambit "is not liable for Force Majeure Events, including, but not limited to acts of God," etc.); *see also* App36.

But Ambit chose not to use similar language in its provision governing unilateral amendments. And "[w]hen parties to the same contract use such different

language to address parallel issues … it is reasonable to infer that they intend this language to mean different things." *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club*, 870 F.3d 682, 690 (7th Cir. 2017). For example, Ambit's contractual promise not to "discriminate or deny service based on race, income, or gender," App36, cannot reasonably—and certainly not unambiguously—be read as a promise not to discriminate against customers who insist on paying in cash. Likewise, a provision authorizing amendments that are "due to" changes in regulations, laws, or tariffs doesn't allow amendments for the purpose of eliminating a price guarantee.

To hold otherwise would be "contrary to well-settled law, which provides that a court cannot alter, change or modify existing terms of a contract, or add new terms or conditions to which the parties do not appear to have assented." *Thompson v. Gordon*, 948 N.E.2d 39, 51 (Ill. 2011). The district court's reading would insert the word "including" into a portion of the contract where Ambit chose not to use it. But because the "contract purports on its face to be a complete expression of the whole agreement, it is to be presumed that the parties introduced into it every material item and term, and in construing it the court will not add thereto another term about which the agreement is silent." *Decatur Lumber & Mfg. Co. v. Crail*, 183 N.E. 228, 229 (Ill. 1932).

**3.** The district court gave another reason for its broad reading of the contract's restrictive amendment language. "Ordinarily," it wrote, "parties to contracts can

amend them for any reason (so long as the requisites for contract formation exist)." SA6 (citing *F.R.S. Dev. Co. v. Am. Cmty. Bank & Tr.*, 58 N.E.3d 26, 32 (Ill. App. Ct. 2016)). Because "parties can always exchange new promises for new consideration," the court declined to read the contract's amendment provision "as abrogating either party's right to renegotiate and bargain for new terms." *Id.* But the contract at issue in *F.R.S. Development*, the case on which the district court relied, did not impose any limits on the parties' authority to amend. The contract here, in contrast, does: It allows Ambit to unilaterally amend only after notice and an opt-out period. Ambit was "free to incorporate [these] conditions for contractual modification" into its contract. *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 297 (7th Cir. 2002); *see also Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148–49 (7th Cir. 1997) ("A vendor, as master of the offer, may ... propose limitations on the kind of conduct that constitutes acceptance."). And, as "the party who drafted the [] agreement," Ambit "is saddled with the consequences of the provision *as drafted*." *Kinkel v. Cingular Wireless, LLC*, 828 N.E.2d 812, 822–23 (Ill. App. Ct. 2005).

The district court may have intended to suggest that the contract can't restrict Ambit's right to amend because, if it did, the company could simply amend the contract to eliminate the restriction. "That would be like orally amending a contract providing for no oral amendments, which the common law allowed on the 'theory' that an oral amendment would first amend the no-amendment clause and then

amend the substance." *Call v. Ameritech Mgmt. Pension Plan*, 475 F.3d 816, 820 (7th Cir. 2007); *see also Wis. Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1286 (7th Cir. 1986). But even assuming that parties cannot restrict their own ability to "bargain for new terms with consideration," SA6, there's no reason why they can't limit their authority to *unilaterally* amend the contract with just a notice. *See, e.g.*, *Maturo v. CF Eagle Brook Arcis, LLC*, 2025 IL App (2d) 240577-U, at ¶ 26 (Ill. App. Ct. 2025) (enforcing agreement that limited drafter's authority to unilaterally amend by requiring a specific type of notice). Ordinarily, "a party may not unilaterally modify a contract" at all. *Robinson*, 19 F.3d at 363. Ambit was thus not required to allow such amendments in *any* circumstances; much less in all of them.

As the district court recognized, any modification of the contract's unilateral-amendment provision would therefore have to "satisfy the criteria for a valid original contract, including offer, acceptance, and consideration." *F.R.S. Dev. Co*, 58 N.E.3d at 32; *see* SA6. Neither Ambit nor the district court, however, have asserted that the amendment here satisfies those requirements. Nor could they. It's true that a customer's continued use of a company's services can, in some cases, constitute consideration. *See Boomer v. AT&T Corp.*, 309 F.3d 404, 416 (7th Cir. 2002). When "there is an existing contractual obligation," however, "a promise to continue performing that legal obligation" is not enough. *Id.*; *see also, e.g.*, *Ray v. R.A. Mech., Inc.*, 2023 IL App (1st) 221639-U, at ¶ 36 (Ill. App. Ct. 2023) (no consideration where

the plaintiff was already "obligated to 'consent' to defendants' completion of []
plumbing work"). That's the case here. As explained above, Ambit's contract already
binds the company to "supply natural gas service" during the contract term at a
"guaranteed" discount, providing only narrow grounds for Ambit to terminate that
obligation. App33, 35. Ambit's agreement to sell "the same exact commodity" for
"significantly higher rates" provides no value to the plaintiffs. App10, 26. That is not
consideration. *See Doyle v. Holy Cross Hosp.*, 682 N.E.2d 68, 71 (Ill. App. Ct. 1997)
("Consideration consists of some right, interest, profit or benefit accruing to one
party, or some forbearance, detriment, loss or responsibility given, suffered or
undertaken by the other.").

## C. The district court correctly rejected Ambit's alternative reading, which would render the amendment provision meaningless.

Unlike the district court, Ambit never disputed below that its unilateral
amendment authority is limited to the three reasons listed. Instead, it turned for
authority to different language, two sentences later in the same paragraph, which
reserves the "right to amend this Agreement *at a later date*." Dkt. 27 at 2 (emphasis
added). This sentence, Ambit claimed, gave it independent authority to amend the
agreement "for any reason." The district court rightly rejected Ambit's position.

"In interpreting a contract," a court presumes that "all provisions were
intended for a purpose, and conflicting provisions will be reconciled if possible so as

to give effect to all of the contract's provisions." *Guterman Partners Energy, LLC v. Bridgeview Bank Grp.*, 105 N.E.3d 91, 103 (Ill. App. Ct. 2018). Ambit's interpretation, however, would turn the first sentence of the amendment section "into a nullity." *Stampley*, 958 F.3d at 586. Under Ambit's reading, that sentence creates a *qualified* right to amend, while the third sentence of the same paragraph creates an "*unqualified*" right to do the same. SA5 (emphasis added). Because any authority granted by a qualified right is also necessarily included in an unqualified one, reading the third sentence that way robs the first sentence's grant of amendment authority of any independent meaning.

"Interpreting contracts so that major clauses fall out usually is not a sensible way to understand the parties' transaction." *Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*, 392 F.3d 881, 883 (7th Cir. 2004). That rule carries special force when the drafter is a "sophisticated corporate entity" like Ambit, which courts "will not simply … release … from the consequences of its bargain." *Brandt v. MillerCoors, LLC*, 993 N.E.2d 116, 122 (Ill. App. Ct. 2013). Instead, courts "must give effect to each and every section of the Agreement," striving to "read the different sections harmoniously." *Air Line Stewards & Stewardesses Ass'n, Loc. 550 v. Trans World Airlines, Inc.*, 713 F.2d 319, 321–22 (7th Cir. 1983).

The district court here had no difficulty harmonizing the contract's amendment provisions. As the court observed, the first sentence is about Ambit's

"right to amend … this Agreement," while the third is about its "right to amend this Agreement *at a later date*." SA5–7 (emphasis added). The third sentence's use of the words "at a later date," App35, the court explained, "suggests a precipitating event— later than something." SA7. And, "[i]n context," that event "must refer to the … change in regulation, laws, or tariffs" on which the amendment is based— "the only referent against which 'later' could apply." *Id.* Thus, the court concluded, the third sentence is best read as "simply a timing provision, giving Ambit flexibility as to when it could amend … in response to one of the previously enumerated changes." *Id.*

The context in which these amendment provisions appear provides further support for this reading. "In construing an instrument" under Illinois law, "all parts should be construed together to determine the true meaning." *Metcalfe v. First Nat. Bank of Pittsfield*, 39 N.E.2d 61, 62 (Ill. App. Ct. 1941). Here, the "AMENDMENTS" section of the contract, read as a whole "may be interpreted to create one consistent plan." *Id.* The first sentence "reserves the right" for Ambit to either "amend or terminate" the agreement "due to" the three listed circumstances. App33, 35. The second sentence says more about terminations, providing circumstances in which Ambit may terminate "without recourse to either party." *Id.* And the third and following sentences switch back to amendments by elaborating on timing and notice requirements. *Id.* In that context, it makes the most sense to read those provisions as

governing the amendments authorized in the paragraph's first sentence—not as an entirely new, separate, and conflicting grant of authority. *See Metcalfe*, 39 N.E.2d at 62 ("One clause of the instrument may be modified or limited by another clause.").

Ambit, in contrast, has offered no alternative account of the words "at a later date." For this Court to adopt its reading would thus again be to "interpret a contract in a manner that would nullify or render provisions meaningless." *Thompson*, 948 N.E.2d at 47.

**D.  At a minimum, the amendment provision is ambiguous and should be construed against Ambit.**

To affirm, this Court must conclude that either the district court or Ambit has the *only* plausible construction of the contract. It cannot do so here. A contract is "ambiguous if it is capable of being understood in more sense than one." *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991). Here, the plaintiffs, Ambit, and the district court have each adopted different readings of the relevant contract language, and all contend that their reading is the only plausible one. "When parties suggest different, yet reasonable interpretations of a contract, the contract is ambiguous." *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 732 (7th Cir. 1996). This Court should thus reverse even if it is persuaded that the district court or Ambit has presented a reasonable construction of the contract's language. The plaintiffs' interpretation—the only one that gives meaning to the contract's enumeration of three circumstances justifying amendment—offers at least an equally

reasonable alternative. And if there is any doubt, the contract's language must "be strictly construed against the drafter"—here, Ambit. *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004).

If Ambit really intended to allow unilateral amendments for any reason, it "easily could have included a provision in the contract" to that effect, "but [it] did not." *Thompson*, 948 N.E.2d at 51 ("[T]here is a presumption against provisions that easily could have been included…."). It could have accomplished that, as the district court suggested, by adding the word "including," by adding a catch-all term ("or any other reason"), or simply by deleting the list of "changes" justifying amendment—thus leaving Ambit's amendment authority open-ended. But since Ambit chose not to do so, it cannot be said that a list of three specific reasons "unambiguously" gives "Ambit the right to seek an amendment *for any reason*," as the district court held, SA7–8. Even the court acknowledged that the agreement was "inartfully drafted" for that purpose. SA6.

At minimum, the agreement's language is thus "reasonably susceptible to more than one meaning." *Cent. Ill. Light Co.*, 821 N.E.2d at 213. And when "language … is ambiguous," "the interpretation of the language is a question of fact which a court cannot properly determine on a motion to dismiss." *Dawson v. Gen. Motors Corp.*, 977 F.2d 369, 373 (7th Cir. 1992); *see Monroe Dearborn Ltd. v. Bd. of Educ.*, 648 N.E.2d 1055, 1058 (Ill. Ct. App. 1995) ("The interpretation of an ambiguous

contract is one of fact which may not be decided on a motion to dismiss[.]"). If there is no fact dispute, the ambiguity must be read against Ambit, as the drafter of this adhesion contract. *See Thomas v. Pearle Vision, Inc.*, 251 F.3d 1132, 1138 (7th Cir. 2001) ("Illinois has long recognized the rule of contract construction that any ambiguity in the contract should be resolved against the drafting party."). The district court therefore erred in dismissing the complaint at the pleading stage.

## II. Ambit's attempted unilateral amendment fails to satisfy the contract's requirements or basic principles of contract formation.

### A. Ambit did not provide the contractually required "material change notice" or opt-out period.

Even assuming the district court was correct that Ambit's contract allowed amendments for any reason, the contract—as the court recognized—would still require the company to comply with its "bargained-for procedures to consummate [the] amendment." SA7. Those procedures require that, before amending its agreement, Ambit must provide its customers with a "material change notice" and "45 days to opt out." App33, 35.

Ambit never provided its customers here with a "material change notice" regarding the new contract terms. Instead, Ambit allegedly sent a mailer that contained the new contract and a cover letter regarding this contract. All the letter said about the "new Terms of Service" was that they were "[e]nclosed." App37 (Simons's letter); *see also* App41 (Bochat's letter with notice stating: "Enclosed you will

find an updated version of your 2012 Terms of Service including information about your options for renewing your current natural gas plan which is scheduled to expire on September 1, 2012."). The supposed "notice" gave "no indication that the referenced terms [were] different," or how they were different, from the terms to which the plaintiffs already agreed. *Odle v. GameStop Corp.*, 2025 WL 947884, at *6 (S.D. Ill. 2025). Although the new contract included only one significant amendment—the addition of the new automatic-default provision—Ambit's curt letter didn't mention it. It didn't tell customers that they would be obligated to "renew" their Guaranteed Savings Plan every year or be automatically defaulted to another one. And it didn't tell them that this new plan, rather than guaranteeing savings over utility rates, would charge them drastically higher prices for the same fungible commodity.

The district court acknowledged that "the letters could have highlighted the new renewal provision better," SA9—indeed, the letters did not mention a material change to the contract at all. Nevertheless, the court found the notice sufficient, concluding that the contract does "not specify that Ambit needed to provide more notice than what [it] sent." *Id.*

But the contract *does* specify exactly that. It does not require just a vague form letter; it requires a "*material change* notice." App33, 35 (emphasis added). The plain meaning of the phrase "material change notice," especially when "strictly construed against the drafter," *Cent. Ill. Light Co.*, 821 N.E.2d at 213, requires at a minimum that

Ambit notify customers of the "change" in terms and the fact that the change is "material." *See Notice, Am. Heritage Dictionary of the Eng. Language* (5th ed. 2022) ("notice" means a "written or printed announcement" or "formal announcement, notification, or warning"). Ambit's letter does neither: It doesn't mention any changes to the terms, nor does it include the word "material."[2]

Ambit likewise failed to honor the contract's opt-out period. The contract's requirement that Ambit "provide" customers 45 days to opt out, App33, 35, again construed against Ambit, requires that the notice *inform* customers of their right to opt out. *See Provide, Am. Heritage Dictionary of the Eng. Language* (5th ed. 2022) (to "provide" means to "furnish," "supply," or "set down as a stipulation or requirement"). Ambit's letter, however, never told customers of that fact. Instead, it announced by fiat that the terms "*will be effective* July 29, 2012." App37 (emphasis added). Nor did Ambit provide an opt-out deadline or a mechanism for opting out. As the district court noted, the company provided contact information that customers could use to "renew their current plan[s] or select a different one." SA8–

---

[2] Ambit's lead argument below on the notice issue was that its contract didn't require notice or opt outs for the new automatic-default provision because that provision is not a "material" term. Dkt. 25 at 12. As the district court pointed out, however, the provision "permitted Ambit to switch plaintiffs from the guaranteed savings plan to one which could charge consumers much more." SA8. Any change that significantly increases price is material. *See Gordon v. Landfill, LLC*, 2021 IL App (5th) 200383-U (Ill. App. Ct. 2021) (holding that a "material term" is "a contractual provision that deals with a significant issue such as price, payment terms, duration, or the duty to be performed").

9; App37. But it gave them no way to opt out of the amended contract, leaving them stuck with the terms' new requirement that they renew "[a]t the end of each 12 month period" or be switched to another plan automatically. App38, 42.

The only way that customers could have learned about these terms would have been to find them "buried in small print within the three-page [] terms of service." App21. Even then, they would have learned only that they could be charged a "a competitive month-to-month variable rate." App38, 42. Not even the terms themselves disclose that this rate would be much higher than the price charged by the local utility—and that the change would therefore destroy the entire purpose of the original contract for guaranteed savings. Again, when the plaintiffs signed up with Ambit, the Guaranteed Savings Plan was the *only* Ambit plan. Thus, both the notice and the terms failed to "state directly" or "put the recipient on inquiry notice" of the amendment's only "contractual significance." *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546, 557–58 (1st Cir. 2005).

Because Ambit provided neither the "material change notice" nor the opt-out period that its contract requires, the company's attempted unilateral amendment was ineffective under the contract's plain terms. *See, e.g.*, *Eutectic Welding Alloys Corp. v. Rauch*, 115 N.E.2d 898, 901 (Ill. 1953) (enforcing contract that allowed "no amendments, modifications, or additions thereof" unless conditions were satisfied); *Maturo*, 2025 IL App (2d) 240577-U, at ¶ 28 (contractual amendment was ineffective where a party

"did not provide proper notice" in the contractually required form). And absent that amendment, Ambit breached the original contract's terms when it broke its contractual price guarantee.

### B. There was no mutual assent or consideration to form a new contract.

**1.** The district court held that the updated terms could have formed a binding contract "[e]ven if plaintiffs did not read" them, noting that "a 'contract need not be read to be effective.'" SA9 (quoting *Hill*, 105 F.3d at 1148). As noted above, however, nobody is arguing here that the amended terms were "made by mutual assent and for consideration." *Ross v. May Co.*, 880 N.E.2d 210, 216 (Ill. App. Ct. 2007). Rather, the question is whether Ambit could *unilaterally* amend its contract simply by providing notice of the new terms. The contract is clear that such an amendment requires specific procedures that Ambit never provided.

Even if this were an ordinary contract-formation case, the plaintiffs wouldn't be bound by the contract terms unless they first received reasonable notice of what those terms say. It's true that "a party who *signs* a written contract is presumed to have notice of all of the contract's terms." *Sgouros*, 817 F.3d at 1034 (emphasis added). But when, as here, a party's purported acceptance of contract terms is *passive*, the contract is enforceable only if the offering party "provides reasonably conspicuous notice of the terms to which the consumer will be bound," and "the consumer takes some action … that unambiguously manifests his or her assent to those terms." *Domer*

*v. Menard, Inc.*, 116 F.4th 686, 695 (7th Cir. 2024); *see also Sgouros*, 817 F.3d at 1034–35 (notice must "adequately communicate all the terms and conditions of the agreement" and the plaintiff must "receive[] reasonable notice of those terms"); *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d Cir. 2012).

The inadequacy of Ambit's notice stands in stark contrast to the notices in the cases on which the district court relied. The parties in those cases provided notice that "clearly and explicitly highlighted the differences between the [amended contract] and the previous terms." *Boomer*, 309 F.3d at 416. And they explained the consequence of those changes. *See Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 714 (7th Cir. 2019) (notice "mentioned the new 'arbitration agreement' eight times; explained that arbitration would become the exclusive forum for covered claims; informed that he was free to opt out without consequence; instructed if he did not elect to opt out that continued employment would be construed as acceptance; and, in the agreement itself, explained in bold and capitalized words that the parties were 'giving up [their] right to a jury trial in any forum'"). Because Ambit's notice, in contrast, "failed to mention several crucial facts" about the amended terms, it did not "provide minimally sufficient notice of contractual modification." *Id.*; *see also, e.g.*, *Engen v. Grocery Delivery E-Servs. USA Inc.*, 453 F.Supp.3d 1231, 1240 (D. Minn. 2020) (notice insufficient where it failed to "call [consumer's] attention" to new arbitration provision); *Schnabel*, 697 F.3d at 123.

**2.** Even if the plaintiffs had received adequate notice of the new terms, they never accepted those terms. Illinois law permits "an offeror [to] construe silence as acceptance if the circumstances make it reasonable to do so." *Gupta*, 934 F.3d at 713. "And this would mean, under general common law principles, … that … acceptance of the modification be manifested with sufficient definiteness to enable a judge or jury to conclude with reasonable confidence that, yes, it was accepted." *Operating Eng'rs Loc. 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 649 (7th Cir. 2001). Because the plaintiffs here "were not reasonably notified of the terms," they could "not provide their unambiguous assent to those terms." *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 64 (1st Cir. 2018). Moreover, "[n]othing in [Ambit's supposed notice] alerts the consumer that," by failing to respond to the notice, "they are assenting to [its] … terms." *Johnson v. Hum. Power of N Co.*, 767 F. Supp. 3d 845, 851 (N.D. Ill. 2025). There is thus no indication that the plaintiffs' "lack of response to [Ambit's] letters was intended to be an acceptance in any way." *Williams v. Cnty. of Cook*, 524 F. Supp. 3d 813, 818 (N.D. Ill. 2021).

## C. Ambit intentionally concealed the amended contract.

Far from effectively notifying customers of the change, Ambit actively misled them. Its letter told customers that the new terms of service "contain[ed] information about your *current* natural gas service plan," without mentioning that their plan would likely soon change. App37; *see also supra* at 39–40 (quoting similar language in Bochat's

letter at App41). The letter stated that "[y]ou *may* renew your current plan or select a different one," without disclosing the consequences of failing to affirmatively renew the plan. *Id.*; *see* SA4–5 (district court acknowledging that Ambit "did not specifically point out the new renewal provision"); *see also* App41. That permissive language ("may") contrasts starkly with the language of the new contract itself, which states that "you *must* renew your Guaranteed Savings Plan to continue to receive the 1% annual savings guarantee." App38 (emphasis added). The notice thus misleadingly "suggests that reviewing the terms is optional." *Odle*, 2025 WL 947884, at *6. Ambit's notice cannot be adequate where it "actively misleads the customer." *Sgouros*, 817 F.3d at 1035–36.

Not content with its opaque and misleading notice, Ambit disguised the notice further by putting it in "inconspicuous mailers" that "appeared as junk mail." App20–21. It is common knowledge that "people receiving paper mail … look at an envelope and discard certain letters, without opening them, from sources from which they did not wish to receive mail based on characteristics of the mail." *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1314 & n.6 (Fed. Cir. 2016). Indeed, the complaint alleges that the mailers "were *designed* to ensure that customers did not read or notice the renewal term or the amended Agreement." App11 (emphasis added).

As a consequence of Ambit's inadequate notice, the company "estimated that 65% of its customers would not" renew their guaranteed savings plans. App10. That

number is especially telling given that none of those customers could have deliberately chosen the Variable Plan, which Ambit did not independently market. There was no reason to choose that plan, which provided "the same exact commodity (gas and electricity)" as the Guaranteed Savings Plan but with much higher prices that "result[ed] in tens of millions of dollars in additional payments to Ambit." *Id.* As one customer complained: "There is no person in their right mind who would want Ambit to move them into a higher cost plan that quadruples!" App19. The only Variable Plan "customers" were those who defaulted into it when they failed to renew—almost certainly because they were unaware of the change. App9, 12. A notice that the sender *ex ante* expects to be ignored by two-thirds of recipients cannot be considered reasonable.

By attempting to enforce the contract "in a manner inconsistent with the reasonable expectation of the parties," Ambit breached not only the plain text of the contract but also the implied covenant of good faith and fair dealing. *Leak v. Bd. of Educ. of Rich Twp. High Sch. Dist. 227,* 41 N.E.3d 501, 506 (Ill. App. Ct. 2015); *see Mid-W. Energy Consultants, Inc. v. Covenant Home, Inc.*, 815 N.E.2d 911, 916 (Ill. App. Ct. 2004) (explaining that the "implied covenant of good faith and fair dealing [] is in every contract" under Illinois law). The implied "covenant bars the party with unilateral power to modify from using that power capriciously." *Pilon v. Discovery Commc'ns, LLC*, --- F. Supp. 3d ---, 2025 WL 752244, at *10 (S.D.N.Y. 2025). By issuing

a "bad faith" notice designed to "ensure that its customers did not in fact notice that it was attempting to deprive them of the [contract's] core benefit," Ambit did just that. App21.

### D. At a minimum, the district court's dismissal at the pleadings stage was premature.

Ambit's notice, in short, bears the hallmarks of a communication designed to provide cover for Ambit while not actually putting anyone on notice. *Cf. Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315 (1950) (holding that, "when notice is a person's due … [t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it"). Ambit intended the "notice" to be ineffective: It created a trap for the unwary, buried it in fine print, disguised it as junk mail, and concealed it behind a letter designed to mislead.

In these circumstances, the words "[y]ou *may* renew your current plan" were woefully inadequate to disclose to customers that, unless they took action, they would soon be paying many times more for the same gas. That conclusion is backed up by the plaintiffs' allegations of complaints from other customers who were also taken unaware by the price increase. *See* App19 (calling Ambit a "scam" that was "prey[ing] on folks who fail to renew their contracts"). And it is further substantiated by allegations that Ambit was investigated by the State of New York for its "practice of moving people off the guaranteed-savings plan into a variable rate plan" with

"significantly higher rates"—a practice that Ambit "conceded … had harmed consumers." App25–26.

Put all this together, and there are more than "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Ultimately, however, "[w]hether the terms of a written contract are modified by acts or conduct is a question for the trier of fact." *Maher & Assocs.*, 640 N.E.2d at 1007. Whether Ambit "adequately communicate[d] all the terms … and whether the circumstances support the assumption that [customers] receive[d] reasonable notice of those terms," "is a fact-intensive inquiry"—especially in circumstances, as here, where the customers "may not realize that [they are] agreeing to a contract at all." *Sgouros*, 817 F.3d at 1034–35; *see also Kinkel*, 857 N.E.2d at 258 ("[W]hether an existing contract has been modified is a question of fact."). For example, because the mailer in which Ambit enclosed its terms is not in the record, the district court had no basis for refusing to credit the plaintiffs' allegation that Ambit intentionally disguised the mailers as "junk mail" to escape its customers' notice. App20–21. At a minimum, the district court erred by making that and other fact-intensive determinations at the pleading stage.

## CONCLUSION

This Court should reverse the decision of the district court.

Respectfully submitted,

*/s/ Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
GREGORY A. BECK
GUPTA WESSLER LLP
2001 K St. NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336

D. GREG BLANKINSHIP
FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP
One North Broadway, Suite 900
White Plains, New York 10601
(914) 298-3281

J. BURKETT MCINTURFF
NATHAN A. RICE
WITTELS MCINTURFF PALIKOVIC
305 Broadway, 7th Floor
New York, NY 10007
(914) 775-8862

June 17, 2025                    *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 32(c) because this brief contains 12,063 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2025, I electronically filed the foregoing brief and appendix with the Clerk of the Court for the U.S. Court of Appeals for the Seventh Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler

# In the United States Court of Appeals for the Seventh Circuit

---

GREGG BOCHAT AND PHILIP SIMONS,
*Plaintiffs-Appellants,*

*v.*

AMBIT ILLINOIS, LLC, ET AL.,
*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:24-cv-03116 (The Hon. Manish S. Shah)

---

## APPELLANTS' SHORT APPENDIX

---

D. GREG BLANKINSHIP
FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP
One North Broadway, Suite 900
White Plains, New York 10601
(914) 298-3281

J. BURKETT MCINTURFF
NATHAN A. RICE
WITTELS MCINTURFF PALIKOVIC
305 Broadway, 7th Floor
New York, NY 10007
(914) 775-8862

MATTHEW W.H. WESSLER
GREGORY BECK
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336

June 17, 2025                    *Counsel for Plaintiffs-Appellants*

## CIRCUIT RULE 30(d) STATEMENT

This brief and appendix comply with Circuit Rule 30(d) because all materials required by Cir. R. 30(a) and (b) are included in the appendix.

_/s/ Matthew W.H. Wessler_
Matthew W.H. Wessler

# INDEX OF SHORT APPENDIX

| ECF and Tab No. | Document | Page |
|---|---|---|
| 29 | District Court Memorandum Opinion and Order | SA1 |
| 30 | Judgment | SA12 |

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

GREGG BOCHAT and PHILIP SIMONS,

        Plaintiffs,

    v.

AMBIT ILLINOIS, LLC, VISTRA CORP,
and VOLT ASSET COMPANY, INC.,

        Defendants.

No. 24 CV 03116

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Defendants Ambit Illinois, LLC, Vistra Corporation, and Volt Asset Company, Inc., are third-party natural gas suppliers that market themselves as less-expensive alternatives to traditional utility providers. In 2009 and 2010, plaintiffs Gregg Bochat and Philip Simons signed up for Ambit's guaranteed savings plan, which promised that plaintiffs' yearly gas costs would be at least 1% less than what their existing utility would have charged, or Ambit would make up the difference.

In 2012, Ambit mailed plaintiffs new terms of service, which required plaintiffs to renew the guaranteed savings plan yearly or be moved into Ambit's more expensive variable plan. The letters accompanying the new terms told plaintiffs that they could either renew their current plan or select a different plan before the new terms went into effect. When plaintiffs did not respond to the notice, Ambit moved plaintiffs from the guaranteed savings plan to its variable plan, which cost plaintiffs much more. Plaintiffs bring this case alleging that Ambit impermissibly attempted to amend their contracts, and that Ambit breached their contracts by switching plaintiffs to the

**SA1**

variable plan and failing to pay plaintiffs the 1% guarantee. Defendants move to dismiss.

## I.    Legal Standards

When reviewing a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a court accepts all well-pled allegations as true and draws all reasonable inferences in favor of the plaintiff. *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 881 (7th Cir. 2022). "To survive a motion to dismiss, a plaintiff must plead 'only enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## II.   Facts

Illinois residents can obtain natural gas from traditional utility providers or third-party energy companies, such as defendant Ambit Illinois, LLC.[1] [21] ¶¶ 1–2, 43. Ambit marketed itself as a less-expensive alternative to existing providers. [21] ¶ 3. Ambit offered Illinois consumers a guaranteed savings plan that promised customers' yearly energy costs would be at least 1% less than what the customers' existing utility would have charged, or Ambit would make up the difference. [21] ¶¶ 3, 5.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. When a document has numbered paragraphs, I cite to the paragraph, for example [21] ¶ 1. The facts are taken from plaintiffs' amended complaint, [21], and notices attached to Ambit's motion to dismiss, [25-1], [25-2]. Plaintiffs argue that it is inappropriate to consider these notices at the motion to dismiss stage. [26] at 7–8. But documents referred to in a complaint that are essential to a plaintiff's claim may be considered on a motion to dismiss. *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018). Plaintiffs refer to the mailed notices in their complaint and the notices are essential to whether plaintiffs' contract claims succeed. *See* [21] ¶¶ 7, 12, 55, 57.

**SA2**

Plaintiffs Philip Simons and Gregg Bochat signed up for the guaranteed savings plan in 2009 and 2010 respectively. [21] ¶¶ 25, 28. The parties' contracts provided:

> Ambit Energy reserves the right to amend or terminate this Agreement due to changes in regulatory rules and requirements, any and all applicable laws, or Nicor's Customer Select tariff. If Nicor materially changes its Customer Select Program, Ambit Energy reserves the right to terminate this contract, without recourse to either party. Ambit Energy reserves the right to amend this Agreement at a later date. If Ambit Energy materially changes the provisions of this Agreement to the disadvantage of the Customer, Ambit Energy will provide 45 days notice prior to the effective date of such material change and provide the customer with 45 days to opt out of the new provisions at no cost, beginning on the postmarked date of the material change notice sent by Ambit Energy to the Customer. If the Customer does not respond to the material change notice within the 45 days to notify Ambit Energy that it elects to opt out of this Agreement within the Customer opt out time period, this Agreement will continue in effect under the amended terms of service.

[21-1] at 3; [21-2] at 3. Bochat's contract also provided that "Ambit may amend the terms of this Agreement at any time, consistent with any applicable law, rule or regulation, by providing notice to [Bochat] of such amendment at least thirty (30) days prior to the effective date thereof." [21-2] at 4.

In 2012, Ambit sent plaintiffs mailers with updated terms of service. [21] at ¶¶ 12, 55; [25-1]; [25-2]. Ambit sent the letters more than 45 days before the new terms of service would go into effect. [25-1] at 2; [25-2] at 2. The new terms required plaintiffs to renew the guaranteed savings plan annually, and if they did not renew, Ambit would move them to its variable plan. [25-1] at 3; [25-2] at 3. The variable plan rates were much higher than those of the local utilities. [21] ¶ 10. The letters told

**SA3**

plaintiffs that they could either renew their current plan or select a different plan, but did not specifically point out the new renewal provision. [25-1] at 2; [25-2] at 2.

Plaintiffs were automatically defaulted into the variable plan and were charged substantially more than they would have been under the savings plan. [21] ¶¶ 8, 10, 26, 29, 47. Plaintiffs allege that they did not know their plan had changed because Ambit lulled customers into thinking they would remain on the guaranteed savings plan. [21] ¶ 20. Plaintiffs also say they could not have reasonably known that they were entitled to, but not receiving, annual reimbursement checks. [21] ¶ 51.

Plaintiffs bring a breach of contract claim, alleging that Ambit impermissibly attempted to amend the contracts when no "changes in regulatory rules and requirements, any and all applicable laws, or Nicor's Customer Select tariff" had occurred. [21] ¶ 11. Plaintiffs also allege that Ambit, even if it were permitted to amend the contracts, did not provide the "material change notice" required by the contracts. [21] ¶ 12. Plaintiffs claim that their original contracts remained in effect, and Ambit breached its contractual obligations by not reimbursing plaintiffs the 1% guarantee annually. [21] ¶ 10.

## III. Analysis

Plaintiffs' breach of contract claims rely on the premise that their original contracts remained in effect, despite Ambit's attempt to amend them.[2] Thus, the

---

[2] This court has subject matter jurisdiction over plaintiffs' claims under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), which creates federal jurisdiction if "(1) a class has 100 or more class members; (2) at least one class member is diverse from at least one defendant; and (3) there is more than $5 million, exclusive of interest and costs, in controversy in the aggregate." *Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 578 (7th Cir. 2017). CAFA

parties' dispute centers on whether Ambit was permitted to amend the plaintiffs' contracts in 2012, and if so, whether Ambit properly followed the contracts' amendment process.

## A.    Right to Amend

The parties' contracts contained at least two provisions that addressed amendment. First, Ambit "reserve[d] the right to amend or terminate this Agreement due to changes in regulatory rules and requirements, any and all applicable laws, or Nicor's Customer Select tariff." [21-1] at 3; [21-2] at 3. And second, Ambit "reserve[d] the right to amend this Agreement at a later date." *Id.*

Plaintiffs argue that the first provision, permitting Ambit to amend "due to changes in regulatory rules and requirements, any and all applicable laws, or Nicor's Customer Select tariff," limited Ambit to amending only if such changes occurred. [26] at 3. Ambit argues that the second provision, "Ambit Energy reserves the right to amend this Agreement at a later date," was an unqualified reservation of the right to amend the contracts. [25] at 10–11.

"The principal objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the contract." *Guterman Partners Energy, LLC v. Bridgeview Bank Grp.*, 2018 IL App (1st) 172196, ¶ 51. In interpreting a contract, a court presumes that "all provisions were intended for a

---

jurisdiction is satisfied because plaintiffs allege that the class includes more than 100 class members; minimal diversity is met because at least one member of the class is a citizen of a different state than a defendant; and the amount in controversy alleged exceeds $5,000,000. [21] ¶¶ 24, 27, 33–34, 38, 78; [1] ¶¶ 14–17. The parties agree that Illinois law applies to plaintiffs' claims. *See* [25] at 6; [26] at 3.

**SA5**

purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions." *Id.* A court should not "interpret a contract in a manner that would nullify or render provisions meaningless." *Id.*

While inartfully drafted, the amendment provisions here do not create a conflict or ambiguity. Plaintiffs construe the first provision as an "express limitation" that banned all amendments other than when one of the enumerated changes occurred. [26] at 4. But the list of three reasons for amendment does not say that they are the only reasons the parties may amend. [21-2] at 3; [21-2] at 3. "Due to" is not synonymous with "only if." Ordinarily, parties to contracts can amend them for any reason (so long as the requisites for contract formation exist). *F.R.S. Dev. Co. v. Am. Cmty. Bank & Tr.*, 2016 IL App (2d) 150157, ¶ 33 ("Parties to a contract are generally free to modify the contract as long as the modification does not violate the law or public policy."). Without text limiting the basis for amendment to only certain reasons, there is no basis to read the list as abrogating either party's right to renegotiate and bargain for new terms with consideration.[3]

True, the contract does not say that Ambit reserves the right to amend for reasons "including" the three items, which would better convey a nonexclusive list, and a nonexclusive reservation of rights may seem superfluous if parties can always exchange new promises for new consideration. But identifying specific albeit

---

[3] Plaintiffs' *ejusdem generis* argument also fails because it erroneously relies on the premise that the first provision defined the "right to amend" as limited to the three enumerated reasons alone. *See* [26] at 4–5. The doctrine also does not apply neatly here. *Ejusdem generis* seeks to identify a common theme among of a list of items to provide a limitation on more general, catchall language that follows that list. The amendment provisions here do not contain a list of specific items followed by a general catch all.

6

**SA6**

nonexclusive reasons warns a customer to be on the lookout for conditions that could prompt Ambit to renegotiate or terminate the contract. In any event, the absence of language of exclusivity is unambiguous.

Plaintiffs also argue that the second provision was simply a timing provision, giving Ambit flexibility as to when it could amend (as opposed to terminate) in response to one of the previously enumerated changes. [26] at 3–4. Ambit says that the first provision already provided when Ambit could amend in response to one of the listed changes: Ambit could amend "due to" the changes, in other words, after and in response to the specified changes. *See* [21-1] at 3; [21-2] at 3. Although "due to" necessarily suggests a sequence of events, it is the language of causation, not deadlines. Similarly, the second provision allows for amendment "at a later time" suggests a precipitating event—later than something. In context, the second provision must refer to the timing of an amendment versus termination due to a change in regulation, laws, or tariffs (the only referent against which "later" could apply). But that does not mean that the first provision limits the reasons Ambit could ever seek amendment. It is the absence of any text suggesting exclusivity that gives Ambit the right to seek an amendment for any reason, subject to the bargained-for procedures to consummate an amendment.[4]

---

[4] Bochat's contract has a third reference to amendments: "Ambit may amend the terms of this Agreement at any time, consistent with any applicable law, rule or regulation, by providing notice to Customer of such amendment at least thirty (30) days prior to the effective date thereof." [21-2] at 4. This term clearly provides that Ambit may amend Bochat's contract for any lawful reason.

**SA7**

Ambit was allowed to try to amend both plaintiffs' contracts in 2012 despite there being no change in regulatory rules, laws, or tariff.

### B.  Amendment Process

Plaintiffs argue that, even if amendment were permissible, Ambit did not follow the contractually agreed upon process for material changes. [26] at 5-8. When "materially chang[ing] the provisions of this Agreement to the disadvantage of the Customer, Ambit Energy [had to] provide 45 days' notice prior to the effective date of such material change and provide the customer with 45 days to opt out of the new provisions at no cost." [21-1] at 3; [21-2] at 3.

A material term is "a contractual provision that deals with a significant issue such as price, payment terms, duration, or the duty to be performed." *Gordon v. Landfill, LLC*, 2021 IL App (5th) 200383-U, ¶ 21 (unreleased for publication in permanent law reports and subject to change until published) (citing Black's Law Dictionary (2001)). Ambit frames the amendment as simply adding a renewal process that was not material to the contract. [25] at 12; [27] at 11–12. But this renewal process permitted Ambit to switch plaintiffs from the guaranteed savings plan to one which could charge consumers much more. As such a change would result in higher rates, *i.e.*, contractual costs, the renewal provision was material.

Plaintiffs admit that Ambit sent them mailers in 2012 that included the new terms of service, [21] ¶¶ 12, 17, 55, 57, but argue that these mailers were insufficient to put them on notice of the material change, [26] at 6. They allege that the mailers appeared as junk mail and were designed to ensure customers did not read or notice the renewal term or amended agreement. [21] ¶¶ 17, 57. Ambit's letters told plaintiffs

8

**SA8**

of the new terms of service, when the terms would go into effect, and gave plaintiffs the option to renew their current plan or select a different one. [25-1] at 2; [25-2] at 2. Plaintiffs emphasize that the letters did not point out the new renewal requirement, did not use the term "material change," and did not tell plaintiffs that they would be shifted to a new plan if they did not renew the savings plan. [26] at 7–8.

While the letters could have highlighted the new renewal provision better, the contracts do not specify that Ambit needed to provide more notice than what they sent. *See* [21-1] at 3; [21-2] at 3. The letters pointed out the terms were "updated" or "new," indicating to plaintiffs that the terms had changed. *See* [25-1] at 2; [25-2] at 2. The letters also attached the new terms giving plaintiffs the opportunity to read them. *See id.* The updated terms of service were only three pages long with the renewal provision on the first page. [25-1] at 3–5; [25-2] at 3–5. Even if plaintiffs did not read the updated terms, a "contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome." *See Hill v. Gateway 2000, Inc.,* 105 F.3d 1147, 1148 (7th Cir. 1997) (holding plaintiffs who skimmed statement of terms accompanying ordered product but not closely enough to discover its arbitration clause were still bound to the terms).

In line with its contractual obligation, Ambit sent the mailers more than 45 days before the new terms of service went into effect and allowed plaintiffs to opt out by either renewing their plan, selecting a new one, or presumably cancelling their contract. [25-1] at 2; [25-2] at 2; [21-1] at 2 (permitting cancellation at any time); [21-

9

**SA9**

2] at 2 (same). Plaintiffs had a reasonable opportunity to reject Ambit's offer, but nonetheless continued to use Ambit's services. *See Boomer v. AT&T Corp.*, 309 F.3d 404, 415 (7th Cir. 2002) (holding letter that clearly provided a mechanism for rejecting updated terms and conditions provided a reasonable opportunity to reject).

Plaintiffs did not respond to Ambit's notice. "[S]ilence can constitute an acceptance of an offer when it is reasonable, because of prior dealings or otherwise, that the offeree should notify the offeror if he does not intend to accept the offer." *Ragan v. AT&T Corp.*, 355 Ill.App.3d 1143, 1149 (5th Dist. 2005). Under the parties' contracts, silence in response to a material change notice is considered acceptance: "If the Customer does not respond to the material change notice within the 45 days to notify Ambit Energy that it elects to opt out of this Agreement within the Customer opt out time period, this Agreement will continue in effect under the amended terms of service." [21-1] at 3; [21-2] at 3. Plaintiffs' continued use of and payment for Ambit's services without protest also constituted acceptance of the updated terms. *See, e.g., Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 713–14 (7th Cir. 2019) (plaintiffs' silence in response to notice granting time to review agreement and method to opt out constituted acceptance of policy changes); *Boomer*, 309 F.3d at 415 (customer's continued use of phone service constituted acceptance of new service terms when letter mailed to him stated that continued use would mean acceptance of the new terms); *Hill*, 105 F.3d at 1148–49 (plaintiffs' silence constituted acceptance of form contract included in product box which plaintiffs accepted). Thus, plaintiffs entered into the amended terms of service.

**SA10**

Under the new terms, Ambit permissibly moved plaintiffs to the variable plan. Because plaintiffs' claims rely on the faulty premise that the original contracts remained in effect, they have failed to state a claim for breach of contract.[5]

## IV. Conclusion

Defendants' motion to dismiss, [25], is granted. Enter judgment and terminate civil case.[6]

ENTER:

_____
Manish S. Shah
United States District Judge

Date: January 27, 2027

---

[5] I do not reach the parties' arguments on waiver or the statute of limitations.

[6] Plaintiffs' claims are dismissed with prejudice because amendment would be futile; a new complaint could not change the contract's unambiguous terms or plaintiffs' acceptance of the new terms of service.

**SA11**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Gregg Bochat, et al.,

Plaintiffs,

v.

Ambit Illinois, LLC, et al.,

Defendants.

Case No.  24-cv-03116
Judge Manish Shah

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $      ,

      which ☐ includes    pre–judgment interest.
            ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☒    in favor of defendant(s) Ambit Illinois, LLC, Vistra Corp, and Volt Asset Company, Inc. and against plaintiff(s) Gregg Bochat and Philip Simons.

.

Defendant(s) shall recover costs from plaintiff(s).

---

☐    other:

---

This action was *(check one)*:

☐ tried by a jury with Judge Manish Shah presiding, and the jury has rendered a verdict.
☐ tried by Judge Manish Shah without a jury and the above decision was reached.
☒ decided by Judge Manish Shah on a motion.

Date:  1/27/2025

Thomas G. Bruton, Clerk of Court

/Susan McClintic , Deputy Clerk

# SA12